# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS ORR, ) <br> ) <br>          **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, Commissioner ) <br> of Social Security, ) <br> ) <br>          **Defendant.** ) | No. 09 C 0982 <br><br> Magistrate Judge Cole |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Thomas Orr, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Mr. Orr asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Mr. Orr applied for DIB on November 27, 2006, alleging that he had been disabled since May 29, 2005, as a result of pulmonary embolism and depression. (Administrative Record ("R.") 120-21, 146). His claim was denied initially and upon reconsideration, and Mr. Orr continued pursuit of his claim by filing a timely request for hearing on May 15, 2007. (R. 81). An administrative law judge ("ALJ") convened a hearing on January 30, 2008. (R. 10-48). Mr. Orr, represented by counsel, appeared and testified. (R. 10). Frank Meldrick testified as a vocational expert. (R. 42-47). On March 24, 2008, the ALJ issued a decision denying Mr. Orr's application because she found Mr. Orr would be able to perform his past light work as a stocker, machine operator, and book seller/cashier. (R. 55-64). This became the final decision of the Commissioner

when the Appeals Council denied Mr. Orr's request for review of the decision on December 23, 2008. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Orr has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Mr. Orr was born on January 19, 1963, making him forty-five years old at the time of the ALJ's decision. (R. 120). He quit high school in the 11th grade, and says he took special education classes while in school. (R. 151). He recently got his GED. (R. 15). He last worked in the stock room of a department store, which involved frequent lifting of 10 pounds; the heaviest weight he lifted was 20 pounds. (R. 148, 156). That job ended when he was laid off during a reduction in force. (R. 146). Before that he had a three-month stint running a packing machine on an assembly line. (R. 158). He stood and operated a machine all day; the heaviest weight he lifted there was ten pounds. (R. 157).

### B.

### Medical Evidence

The medical record in this case is some 400 pages long.[1] It demonstrates that Mr. Orr suffers

---

[1] A good portion of that is hand-written scribbles, many of which are illegible. It's not even clear whether the medical reports are in any semblance of chronological order. Neither brief makes much of an effort to summarize the record or refer to the salient points. For example, the plaintiff's brief spends just fifteen lines on the medical evidence. (*Plaintiff's Brief in Support of Motion for Summary Judgment*, at 2). In doing so,
(continued...)

from achalasia, which is a rare disease of the muscle of the esophagus which results in difficulty swallowing food and passing it into the stomach. www.medicenet.com. Mr. Orr's difficulties evidently date back to 1997, when he was diagnosed with an underdeveloped esophagus. (R. 254). Over the years, he has lost a fair amount of weight. Mr. Orr, who is 5'6½" tall, claims that at one time he weighed 140 pounds. (R. 40). More recently, however, between January 2006 and December 2007, his weight has fluctuated between a high of 121 pounds on November 28, 2006 (R. 218) to a low of 110 pounds on December 6, 2007. (R. 590, *see also* R. 217, 220, 221, 474, 592, 595, 597, 598, 600).

From October 16 to October 26, 2006, Mr. Orr was hospitalized for massive pulmonary emboli and deep venous thrombosis ("DVT") of the left leg. (R. 254). He was treated with Heparin, an anticoagulant, intravenously, and Coumadin, another anticoagulant, orally. (R. 255). When he was discharged, he began followup treatment at the Vista clinic with Dr. Yolanda Escalona. (R. 255). He saw her regularly through at least December 2007. According to treatment notes, Mr. Orr seemed to respond well to treatment following his hospitalization, with no recurrent pulmonary emboli or DVT (R. 286, 590-602), and either no swelling (R. 590, 592-96, 598-600), or minimal swelling (R. 597, 602) in Mr. Orr's left leg. Mr. Orr generally had no complaints. (R. 590-91, 593, 595-98). On two occasions, however, in November 2006 and December 2007, Dr. Escalona filled

---

¹(...continued)
it essentially glosses over the record, referring to nothing more than diagnoses, prescribed medications, and dates of treatment. There is nothing regarding whether a doctor ever said plaintiff was disabled or limited in any way. There is nothing about the results of any clinical tests. By contrast, the brief spends three full pages on the hearing testimony which spanned just 35 pages in the original record, and does so rather painstakingly. (*Plaintiff's Brief in Support of Motion for Summary Judgment*, at 2-5). But the transcript testimony is type-written, printed, simple to decipher, and easy to analyze even for one with no familiarity to the case. Not so for the medical record.

out disability questionnaires indicating she felt Mr. Orr would be unable to perform any work. *See, infra,* at XX.

The Agency arranged for Mr. Orr to have a consultative psychological evaluation on January 30, 2007. (R. 534). Psychologist Randy Kettering noted that Mr. Orr was mildly depressed with a slightly constricted affect. (R. 536). His memory and general knowledge were essentially intact. (R. 536). He could not perform serial sevens perfectly; he made one error. (R. 536). His thinking was generally concrete, and his judgment was fair. (R. 537). Dr. Kettering made no diagnosis of depression or affective disorder. (R. 537). Later, Agency psychologist Carl Hermsmeyer reviewed the record and found Mr. Orr to have a mild restriction of daily activities, mild difficulties with social functioning, and mild difficulties in concentration. (R. 556).

## C.

### Administrative Hearing Testimony

#### 1.

#### Plaintiff's Testimony

At his hearing, Mr. Orr testified that he was homeless, and that he slept at a shelter or his friend's car. (R. 14-15). He explained that had the department store he was working at in 2005 not gone through a staff reduction, he would have continued working there. (R. 17). He was able to work there despite his achalasia, although he had to limit his eating during the day because of his difficulty swallowing. (R. 36-37). But once he suffered his pulmonary embolism in October 2006, his doctor told him he shouldn't go back to work. (R. 18). Mr. Orr explained that if he stood or sat for too long, he might develop blood clots. (R. 18). He wasn't sure whether he could handle a job that allowed him to alternate between sitting and standing. (R. 18). He wears special socks to

control his condition. (R. 32).

Mr. Orr testified he has had no signs of any pulmonary embolism or DVTs since his hospitalization, and that he was still taking Coumadin. (R. 19). His doctor thought he might have to take it. (R. 19). He said he always he gets a numbness or a tingling in his left leg that comes and goes. (R. 25-26). It feels like a balloon inflating. (R. 25). Sitting makes it worse. (R. 26). He has some pain in his back muscles about once a month, but not as bad as his leg. (R. 27). Even so, he said the pain might last for two days and he took codeine for it. (R. 39). Mr. Orr said it came from his achalasia and was brought on by what he ate. (R. 27). He also gets a dull pain in his throat and chest when he eats. (R. 28). Mr. Orr said he has suicidal thoughts every day but would never act on them. (R. 29).

Mr. Orr said he could probably walk one or two blocks before he had to sit down. (R. 29). He thought he could sit for an hour, but didn't think he could stand for that long – he hadn't tried. (R. 30). He said he might be able to lift twenty pounds if he used both hands. (R. 30). He explained that he had no muscles in his arms. (R. 30).

On a typical day he would go to a mall or the library. (R. 31). At the library, he would use the internet for forty-five minutes to an hour and then get up and walk around. (R. 31). Due to his achalasia and taking Coumadin, he had a very limited diet. (R. 31). Due to his achalasia, he had to swallow repeatedly just to get his food down. (R. 37). It could take a few minutes or up to an hour. (R. 37). He doesn't do any household chores. (R. 32). He doesn't bathe or shower often, only once every one or two weeks. (R. 32). Mr. Orr explained that it was too much trouble to take the therapeutic sock off and on. (R. 32).

**2.**

**Vocational Expert's Testimony**

Mr. Meldrick, the vocational expert ("VE"), testified that Mr. Orr's past stock work at the department store was semi-skilled and light. (R. 43). His machine operator job and his bookstore cashier job were light, but unskilled. (R. 43). The ALJ asked the VE whether a person with Mr. Orr's vocational background, who could sit for six to eight hours a day, stand and walk six to eight hours a day, and lift and carry up to ten pounds frequently could perform these jobs; the VE said they could. (R. 43). If the person had to change from sitting to standing every forty-five minutes, the VE said they could perform the machine operator job and perhaps some bookstore cashier jobs. (R. 43-44). Such a person could also do general assembly work, packaging work, or inspection work. (R. 44). In the local economy, there were 5000 assembly jobs, 6000 packaging jobs, and 2000 simple inspection jobs. (R. 44). If a person could lift no more than ten pounds, and only rarely, they could perform sedentary work. (R. 45). If a person had to take unscheduled breaks to go for walks, such work would be precluded.

**III.**

**THE ALJ'S DECISION**

The ALJ found Mr. Orr to have the following severe impairments: history of deep vein thrombosis and pulmonary embolism, mild depression, and esophageal achalasia. (R. 57). The ALJ next determined Mr. Orr's impairments failed to meet any listing, specifically listing 3.02 for chronic pulmonary insufficiency, listing 4.11 for chronic venous insufficiency, and listing 5.03 for stricture of the esophagus. (R. 58). Essentially, Mr. Orr did not present the necessary medical evidence – test results and clinical findings – to establish the criteria necessary to meet these listings. (R. 58). The

ALJ further found that Mr. Orr's depression only results in mild restrictions at the most; not the marked restrictions required under the applicable listing for affective disorders. (R. 58).

The ALJ then recounted Mr. Orr's testimony and reviewed the medical record at length. (R. 60-63). The ALJ determined that Mr. Orr retained the capacity to perform light work (R. 59), which the regulations define as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §404.1567(b). The ALJ also felt Mr. Orr's allegations regarding the extent of the limitations his impairments caused was not entirely credible considering the medical evidence, his course of treatment, the success of that treatment, and his daily activities. (R. 62-63).

The ALJ went on to discuss the opinion of Mr. Orr's treating physician. She said that the doctor's statement that Mr. Orr was "disabled" was not conclusive and contrasted sharply with the rest of the medical evidence. (R. 63). She noted that it was rendered just one month after Mr. Orr's hospitalization for pulmonary emboli and deep vein thrombosis; disability had to last or be expected to last for a year. (R. 63). Treatment was conservative thereafter. Moreover, the ALJ pointed out that Mr. Orr had worked despite his achalasia prior to being laid off. (R. 63).

The ALJ then went on to consider the testimony of the VE. Mr. Orr's past relevant work as a stocker, book seller/cashier, and machine operator was light and semi-skilled. Because that did not exceed Mr. Orr's residual functional capacity for light work, Mr. Orr could still perform such jobs. The ALJ concluded, accordingly, that Mr. Orr was not disabled and not entitled to DIB.

# IV.

# DISCUSSION

## A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate

conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**

**Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof

9

through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

### 1.

Among other things, Mr. Orr takes issue with the ALJ's treatment of his treating physician's opinion. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with the patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon,* 270 F.3d at 1177. The Seventh Circuit has expressed some puzzlement about the rule:

> Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.

*Hofslien*, 439 F.3d at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician has examined the claimant, whether the physician is a specialist in the condition

claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well. *Id.* at 377; 20 C.F.R. § 404.1527(d).

Dr. Yolanda Escalona appears to have filled out two forms regarding Mr. Orr's ability to work, one in November 2006, and one in December 2007. In November 2006, she said Mr. Orr could work no more than one hour a day, due to his pulmonary embolism and left leg deep vein thrombosis. (R. 621). Mr Orr could stand for a total of an hour, but only fifteen minutes at a time; sit for an hour, but again, only for fifteen minutes at a time. (R. 621). She circled "yes" when asked whether he had to "lie down at unpredictable intervals." (R. 621). He had no difficulty with his hands; he could manipulate frequently throughout the day. (R. 621). She answered "?" to the question of how much he could lift or carry. (R. 621).

In December 2007, Dr. Escalona reported that Mr. Orr had the following diagnosed impairments: chronic bilateral DVTs, achalasia, chronic venous stasis of the left leg, pulmonary embolisms, and decreased BMI. (R. 615). Although she did not count "depression" among his diagnosed impairments, she later indicated he was depressed, anxious, socially withdrawn, and suffered cognitive limitations and a reduced ability to concentrate on tasks. (R. 617). The doctor thought Mr. Orr could walk a half of a block, sit for no more than forty-five minutes at a time and stand for no more than ten minutes at a time. (R. 617). He could sit, stand, and/or walk for only two hours out of an eight-hour day. (R. 617). She also said he *had* to walk every five minutes for two to three minutes. (R. 617). Mr. Orr could lift and carry no more than ten pounds, and only rarely. (R. 618). Dr. Escalona said he was extremely limited in his ability to manipulate – down to 25% of an eight-hour day. (R. 619)

If an ALJ does not give the treating physician's opinion controlling weight, she has to provide "good reasons" for how much weight she accords it. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007). Here, the ALJ rejected Dr. Escalona's opinion for two reasons: she felt it was inconsistent with the doctor's own notes and course of treatment and "[p]erhaps most importantly, this opinion was rendered only one month after claimant's hospitalization for massive pulmonary emboli and DVTs." (R. 63). The first point is not much of a problem. An ALJ can discount a treating physician's opinion if it is internally inconsistent, *Denton v. Astrue*, – F.3d –, –, 2010 WL 652979, *5 (7th Cir. 2010); *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008), inconsistent with the physician's treatment notes, *Schmidt v. Astrue*, 496 F.3d 833, 842-43 (7th Cir. 2007), or inconsistent with other substantial evidence in the record. *Moss,* 555 F.3d at 560; *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir.2008).

According to treatment notes, Mr. Orr seemed to respond well to treatment following his hospitalization, with no recurrent pulmonary emboli or DVT (R. 286, 590-602), and either no swelling (R. 590, 592-96, 598-600), or minimal swelling (R. 597, 602) in Mr. Orr's left leg. Mr. Orr generally had no complaints. (R. 590-91, 593, 595-98). Mr. Orr does not argue otherwise; he submits only that the doctor based her opinion on more than a dozen visits and diagnosed conditions of chronic bilateral deep vein thrombosis, achalasia, chronic venous stasis, and decreased BMI. (*Plaintiff's Brief in Support of Motion for Summary Judgment*, at 10; *Plaintiff's Reply Brief*, at 4). But doctor visits and diagnoses alone do not establish disability.

Moreover, Dr. Escalona's opinions do not even make a great deal of sense internally. She says Mr. Orr suffers from *chronic* DVTs, but the record reveals only one occasion when he had a DVT. Between November 2006 and December 2007, she said Mr. Orr's ability to use his hands

12

deteriorated significantly for no apparent reason; at least no reason pointed out in the medical record. She doesn't list depression as a diagnosis, but at the same time says Mr. Orr suffers from depression. Moreover, it's entirely unclear how Mr. Orr can possibly get through a day, even away from work, with the restrictions she places on his ability to sit and stand, especially since she claims he has to walk for two or three minutes every five minutes.

But the other reason the ALJ gave for discounting Dr. Escalona's opinion, the "most important[]" reason, is simply wrong. True, one opinion was rendered on the heels of Mr. Orr's hospitalization, but the other was over a year later. It was also the more detailed of the two. It is unclear from the ALJ's opinion whether she considered it, because she referred only to the opinion that immediately followed the hospital stay. It could be that the ALJ might have rejected Dr. Escalona's opinions based on their inconsistency with the evidence alone, but there is no way to tell, especially as the ALJ felt the timing of the earlier opinion was the most important reason for rejecting it. If a reviewing court can't follow the ALJ's line of reasoning, the Seventh Circuit mandates that the case be remanded, even if the record may support the ALJ's ultimate conclusion. *Sarchet*, 78 F.3d at 307. Consequently, the "logical bridge" rule dictates that this case be remanded to the Commissioner for another look.

**2.**

So a remand is necessary, but it is worth addressing a couple of Mr. Orr's other arguments, to clarify things for the next go-round. The first deals with the ALJ's determination that Mr. Orr's achalasia did not meet the Listing of Impairments. When she determined that Mr. Orr's weight loss due to achalasia did not meet the requirements of listing 5.03, she noted that Mr. Orr did not have

13

the required evidence of weight equal to or less than 102 pounds for his height of 66 inches. (R. 58). That listing was no longer applicable when the ALJ rendered her decision. 72 Fed.Reg. 59398. The new listing – the applicable listing – eschewed the table of heights and weights for a calculation of body mass index or "BMI":

> 5.08 Weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period.

20 C.F.R. Pt. 404, Subpt. P, App. 1. BMI is calculated by dividing the individual weight in pounds by his height in inches squared times 703. Mr. Orr's height is almost in variably measured as 66.5 inches in his medical records, with the exception of a single occasion when it is said to be 67 inches. At 66.5 inches, Mr. Orr's weight would have to be less than 110.08 pounds for him to register a body mass of less than 17.50. As Mr. Orr concedes, that happened on a single occasion, December 6, 2007. (*Plaintiff's Reply Brief*, at 2).

But one evaluation meeting the 17.50 benchmark is clearly not sufficient to meet the listing, as it requires two such BMI results at least 60 days, but not more than six months, apart. In order to meet the listing, a claimant must "meet *all* of the specified medical criteria." *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990) (noting further that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify"). So even if the ALJ had applied the new listing, her conclusion would have had to have remained the same. The ALJ's mistake, then, was harmless error, which is applicable in the context of Social Security disability benefits determinations. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Keys v. Barnhart,* 347 F.3d 990, 994-95 (7th Cir.2003). The error did not alter the result.

Mr. Orr says that because his most recent evaluation was on December 6, 2007, and that evaluation resulted in a BMI of less than 17.50, it was incumbent upon the ALJ to request later evaluations – either additional records or a consultative examination – so that it could be determined if Mr. Orr's BMI was also under 17.50 at least two months later. (*Plaintiff's Reply Brief*, at 2). Such a rule would mean that ALJs could never render a final disability determination just in case later evidence might possibly show that the claimant meets the listings. Cases would just remain open indefinitely. If that sounds nonsensical, it is because it is and is thus a conclusion that must be rejected. *Cf.* Posner, Cardozo: A Study in Reputation, 118 (1990)("The soundness of a conclusion may not infrequently be tested by its consequences."); *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 741 (1985) ("An examination of the consequences that would follow upon adoption of the contrary rule proposed by the Court of Appeals in these cases confirms the soundness of this conclusion").

It is true, as Mr. Orr contends, that ALJs have a duty to develop the record, but she is required only to make a reasonable effort to ensure that the record includes enough information to render a decision. *Skinner v. Astrue,* 478 F.3d 836, 843-44 (7th Cir.2007). Moreover, when the claimant is represented by counsel, as Mr. Orr was here, the ALJ is entitled to assume the claimant has made his strongest case for an award of benefits. *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988). After all, even a *pro se* litigant bears some responsibility for making a record. *Johnson v. Barnhart,* 449 F.3d 804, 808 (7th Cir.2006).

It's not as though the ALJ ought to have been alerted to any deficiency in the evidence by a huge gap in the record. *See*, *e.g,, Nelms,* 553 F.3d at 1098-99 (holding that ALJ failed to adequately develop record where there was a two-year evidentiary gap). The record was current through

December 2007; the hearing was in January 2008. Evidence in these cases doesn't get any "fresher", and there is no absolute requirement that an ALJ update the medical records to the time of the hearing. *Nelms*, 553 F.3d at 1099; *Luna v. Shalala,* 22 F.3d 687, 692-93 (7th Cir. 1994). If there were additional evidence that would have indicated Mr. Orr met the listing, his attorney ought to have presented it. It is not enough for Mr. Orr to speculate that there might be some evidence in the future. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).[2] And it is telling that, even now, over a year after the hearing, he has not come forward with any additional BMI evaluations from his physician. *Cf. Nelms*, 555 F.3d at 1098 (claimant presented evidence to support theory that ALJ likely would have found him disabled had he considered it). On remand, this issue will likely not resurface since the new listing has been on the books for a while, and Mr. Orr's attorney will be aware of alert to it – and the limits of the ALJ's responsibilities – in accumulated evidence to support Mr. Orr's claim.

**3.**

Mr. Orr also had a problem with the ALJ determining the he had a severe mental impairment at step 2, while at the same time finding it results in only mild restrictions and does not affect his residual functional capacity. There is an internal logic to the argument that is appealing. An impairment or combination of impairments is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among other things: walking, standing, sitting, lifting, pushing, reaching, carrying, handling;

---

[2] In this regard, the plaintiff's brief mischaracterizes the record to a degree, claiming that records show a consistent pattern of weight loss from October 2006 to December 2007. (*Plaintiff's Reply Brief*, at 2). Not exactly. Mr. Orr weighed 115.5 pounds on October 16, 2006. (R. 474). Subsequent readings were 119, 121, 113, 115, 114.5, 115, 111, 112, and 110.

16

understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Conversely, an impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, *3; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). It would certainly seem, then, that a severe mental impairment – one that by definition "significantly limits" the ability to perform basic work activity – would have to have some impact on an individual's residual functional capacity.

To confuse things even more, recall that the ALJ found that Mr. Orr had only mild restrictions on his activities of daily living, mild difficulties in social functioning, mild difficulties in concentration, and had no episodes of decompensation. (R. 58). Under the Commissioner's regulations, these findings would ordinarily translate into a determination that the claimant did *not* have a severe mental impairment:

> (d) Use of the technique to evaluate mental impairments. After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).
>
> (1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

20 C.F.R. § 404.1520a(d). But despite her findings regarding Mr. Orr's limitations in the functional

17

areas, the ALJ here determined that Mr. Orr's mental impairment *was* severe. In his brief, the Commissioner concedes that, giving the flow of the ALJ's reasoning, this may have been an error. (*Memorandum in Support of the Commissioner's Motion for Summary Judgment*, at 11). Then, she determined that it had no effect on Mr. Orr's capacity for light work, which would seem to equate to a finding that there was no more than a minimal limitation on his ability to do basic work activities. That may well have been how the ALJ saw it, but on remand she should offer an explanation of her rationale in order the meet the "logical bridge" requirement.

Finally, Mr. Orr contends that the ALJ failed to consider the specific demands of his past work, especially whether the jobs allowed for a sit/stand option. But the VE reviewed Mr. Orr's descriptions of his past work and questioned him at the hearing. He categorized Mr. Orr's jobs as light and either semi-skilled or unskilled, and the ALJ was entitled to rely on this testimony. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Moreover, the ALJ did not have to find that Mr. Orr was capable of returning to the precise job he used to have; it is enough that he can perform jobs substantially like that one. *Getch v. Astrue,* 539 F.3d 473, 482 (7th Cir.2008). As for a sit/stand option, the ALJ did consider it, and actually questioned the VE regarding it. The VE indicated that machine operator jobs and some bookstore cashier jobs would allow alternating positions. In the final analysis, though, the ALJ evidently chose to believe that such an option was unnecessary. The ALJ was entitled to do that, of course, *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Schmidt,* 496 F.3d at 846, as long as her determination was supported by substantial evidence. Whether it was is another matter that need not be delved into here because a remand is necessary in any event.

## V.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 10/18/10